**RHODIA, INC., Appellant,**

v.

**HARRIS COUNTY et al., Appellees.**

**No. 15784.**

Court of Civil Appeals of Texas,
Houston (1st Dist.).

Aug. 5, 1971.

Baskin, Fakes & Stanton, Stanley D. Baskin, Pasadena, for appellant.

Joe Resweber, County Atty., Gus Drake, James R. Doxey, Asst. County Attys., Houston, Crawford C. Martin, Atty. Gen. of Texas, Nola White, First Asst. Atty. Gen., Alfred Walker, Executive Asst. Atty. Gen., Roger Tyler, Vince Taylor, Richard W. Chote, A. J. Gallerano, Asst. Attys. Gen., Austin, for appellees.

PEDEN, Justice.

Appeal from the granting of a temporary mandatory injunction against Rhodia, Inc., a chemical company which produces insecticides, weed killers and similar products containing arsenic.

Harris County brought this cause of action under the Texas Water Quality Act, Article 7621d–1, Vernon's Texas Civil Statutes, seeking temporary and permanent injunctions and civil penalties, charging that Rhodia was discharging wastes containing excessive arsenic into or adjacent to Vince Bayou, one of the public waters of Texas. The Texas Water Quality Board filed an intervention in which it also sought to have Rhodia enjoined from unauthorized discharges of wastes containing arsenic in violation of the Act.

The appellant does not complain of the trial court's having ordered, after a hearing, that Rhodia be temporarily enjoined from all activities at its plant which will produce arsenic laden water drainage into or adjacent to, the waters of Vince Bayou, a public body of water near the Rhodia plant. Rhodia's appeal is directed to the following mandatory provisions in the temporary injunction:

"Further, that the Defendant, Rhodia, Inc., is hereby ORDERED forthwith to:

"1. Repair in a good and workmanlike manner with tamped, arsenic free soil those breeches existing in the high ground separating Vince Bayou from the tidal flats adjacent to Defendant's property. Place such additional dikes as are necessary to prevent the entry of water into such tidal flats at periods of high tide.

"2. Core that portion of property owned by Houston Lighting & Power Company to the North and East, immediately adjacent and contiguous to the land owned by the Defendant at intervals of 25 feet to such a depth as is necessary to achieve arsenic free soil, filling the core holes with a solution of slaked lime. Remove all arsenically contaminated top soil and replace same with that by-product or waste product from cement manufacturing processes known

as 'precipitator dust' to a depth of four inches. After which the arsenically contaminated soil removed from the Houston Lighting & Power Company property may be replaced on top of the aforesaid 'precipitator dust.'

"3. Core the perimeter of the Defendant's property on the South and West boundary at 50' intervals to a depth of one foot or until arsenic free soild is achieved.

"4. Core the East perimeter of Defendant's property from the Southern boundary line to the entrance leading to Defendant's plant site at intervals of 50' to a depth of one foot or until arsenic free soil is achieved.

"5. Core the remainder of the East boundary line and the North boundary line at intervals of 25' to a depth of 2' or until arsenic free soil is achieved.

"6. Core the portion of Defendant's property South of the Southern most building thereon at 50' intervals (not previously cored) to a depth of 1' or until arsenic free soil is achieved, being the South 150' of said property.

"7. Core, on a line not more than 4' from all concrete buildings, dikes and other operating areas on Defendant's property, at intervals of 25' to a depth of 2' or until arsenic free soil is achieved. On a line parallel to such line, not separated more than 25' from such line and further removed from said concrete buildings, dikes and other operating areas, core at intervals of 25' to a depth of 2' or until arsenic free soil is achieved.

"8. Remove the arsenically contaminated soil from the slag waste pile, located on the Northerly side of Defendant's property and the Southerly side of the adjoining property owned by Houston Lighting & Power Company, the evaporation pit area, located on Defendant's property, and the railroad spur line unloading area and place in a good and workmanlike manner on the previously prepared tidal flat areas described in # 1 hereof.

"9. Fill all core holes with slaked lime solution.

"10. All core holes mentioned herein are to be 4″ in diameter.

"11. Determine the source of the water surfacing in the artesian spring located ten feet North of the North end of the Defendant's railroad spur track.

"12. Cover replaced soil and all areas from which soil is removed with arsenic free compacted earth to a depth of natural ground level. The surface of these areas should be graded smooth in such a manner as to allow proper drainage and not cover any currently exposed transmission tower foundations or footings. These areas should be seeded thereafter with Bermuda grasses so as to avoid erosion."

No findings of fact or conclusions of law were made in addition to those stated in the trial court's order.

At the hearing on the applications for temporary injunction, evidence was introduced that arsenic in excess of the concentration permitted by the "Hazardous Metals Regulation" of the Texas Water Quality Board (one part per million) had been found in the tidal waters of Vince Bayou where natural drainage from the Rhodia plant would carry it and in the fluids being discharged from the Rhodia plant into the City of Pasadena sewer system. There was evidence that the arsenic found in the sewer system originated in the operation of the plant and that it would also eventually reach Vince Bayou but that it would by then be less concentrated. There was also evidence that excessive concentrations of arsenic were found in Vince Bayou as a result of a recent purging of the plant's sprinkler system. However, it appeared from the evidence that one of the principle sources of arsenic in the bayou was that which had, at some time in the past, been deposited on the properties of

both Rhodia and the adjacent property of Houston Lighting & Power Co. by operation of Rhodia's plant and was being washed into the bayou by rains and by high tides. Large concentrations of arsenic were found on and in the soil of Rhodia's plant and that of the property of Houston Lighting & Power Co.

Rhodia's corporate predecessor formerly had permission from the Texas Water Quality Board to dump certain of its wastes containing arsenic in a pit and a ditch on its own property, but it sought and obtained cancellation of its permits in 1969 because it had developed a recycling system for its wastes and no longer wished to dump them. It did not appear from the evidence that Rhodia is now knowingly depositing arsenic on the land or in the bayou.

In 1947 Rhodia's predecessor conveyed to Houston Lighting & Power Co. a 4.761 acre strip of land on the north and east sides of the Rhodia plant. Vince Bayou flows across the northeast part of both the Rhodia and the Houston Lighting & Power Co. tracts, and the evidence showed that after rains the natural drainage flow of surface water from parts of the Rhodia land was across the Houston Lighting & Power Co. tract into and adjacent to Vince Bayou.

Rhodia's single point of error is:

"The trial court abused its discretion in issuing a temporary mandatory injunction in that:

"A. It placed on appellant a burden greater than required for the protection of appellees.

"B. It granted all of the relief available to appellees on the trial on its merits.

"C. It granted equitable relief though appellees had an adequate remedy at law.

"D. It granted equitable relief which was in excess of that requested in the petitions and prayers.

"E. It required appellant to perform burdensome duties that were not described in appellee's petitions and prayers, violating the due process and equal protection clauses of the Texas and United States Constitution."

In a hearing on an application for a temporary injunction the only question before the court is the right of the applicant to a preservation of the status quo of the subject matter of the suit pending a final trial of the case on its merits. To warrant the issuance of the writ, the applicant need only show a probable right and a probable injury; he is not required to establish that he will finally prevail in the litigation. Where the pleadings and the evidence present a case of probable right and probable injury, the trial court is clothed with broad discretion in determining whether to issue the writ and its order will be reversed only on a showing of a clear abuse of discretion. Transport Co. of Texas v. Robertson Transports, Inc., 152 Tex. 551, 261 S.W.2d 549 (1953).

Although ordinarily a mandatory injunction will not be granted before final hearing, a trial court has the power to grant a mandatory injunction at a hearing for a temporary injunction where the circumstances justify it. Whether a temporary mandatory injunction will be granted is within the sound discretion of the trial court. The grant thereof will be denied, however, unless the right thereto is clear and compelling and a case of extreme necessity or hardship is presented. 31 Tex. Jur.2d 85, Injunction, § 32.

Generally, the preservation of the quo can be accomplished by an injunction prohibitory in form, but it sometimes happens that the status quo is a condition not of rest, but of action, and the condition of rest is exactly what will inflict the irreparable injury on complainant. In such a case, courts of equity issue mandatory writs before the case is heard on its merits. This character of cases has been repeatedly

held to constitute an exception to the general rule that temporary injunction may not be resorted to to obtain all relief sought in the main action; such temporary injunction may be mandatory in character. McMurrey Refining Co. v. State, 149 S.W.2d 276 (Tex. Civ.App.1941, writ ref.).

■ The status quo was an unpolluted river. We are not dealing merely with the threat of irreparable injury when pollution of public waters is shown; the irreparable injury has been demonstrated. Magnolia Petroleum Co. v. State, 218 S.W.2d 855 (Tex.Civ.App.1949, writ ref. n. r. e.).

■ We sustain Section A of the appellant's point of error, having concluded that there should be a modification of the mandatory provisions of the temporary order. A temporary injunction preserves the status quo until final hearing, and it should go no further than equity requires. 31 Tex.Jur.2d 48, Injunctions, § 12; Cozby v. Armstrong, 191 S.W.2d 786 (Tex.Civ. App.1945, no writ); Texas Co. v. Watkins, 82 S.W.2d 1079 (Tex.Civ.App.1935, no writ); Dallas General Drivers, etc. v. Wamix, Inc., of Dallas, 156 Tex. 408, 295 S.W.2d 873 (1956).

We consider that it was necessary for the order to contain some mandatory provisions; that part of it (not complained about on this appeal) which required Rhodia to cease all activities which produce arsenic-laden water drainage was not sufficient to prevent arsenic from reaching public waters from the Rhodia plant in excessive concentrations. As we have noticed, arsenic was already on and in the ground at the plant and was being picked up and put into the bayou by surface water drainage and by high tides.

■ But Rhodia does not violate the Texas Water Quality Act by having arsenic on its land. At one time it had permits to dump its arsenic wastes there. It is Rhodia's allowing this arsenic to pollute public waters that is to be enjoined. How to do so under a temporary order before a full trial on

the merits is a difficult problem. The appellees have shown that irreparable injury is occurring and that a statute is being violated, and they are entitled to a temporary mandatory injunction which will require Rhodia to prevent excessive quantities of arsenic from polluting the public water in the manner in which the appellees have shown Rhodia has done so. The appellees are not entitled to more than this pending a final trial.

Stated another way, under the evidence it would have been proper, pending trial on the merits, to include in the order a provision requiring Rhodia to prevent surface water and tidal water from directly or indirectly carrying arsenic in concentrations of more than one part per million into or adjacent to Vince Bayou from Rhodia's property; the provisions of the trial court's order requiring Rhodia (on its own land) to repair breaches in the high ground, to build additional dikes and to determine the source of the "artesian spring" were directed to this end. It should be left to Rhodia to determine how it might best make certain the proven pollution was stopped.

■ Much of the work which Rhodia was ordered to do in response to the mandatory provisions of the temporary injunction is on the land owned by the Houston Lighting & Power Co., which company is not a party to this suit. The appellant raises this matter under another Section (E) of its brief, but it is not necessary for one who appeals from an order in temporary injunction proceedings to even file a brief, and assignments of error need not be included in any brief filed. Lowe and Archer, Injunctions and other Extraordinary Proceedings (1957) 388–9, § 363. Since the utility company was not a party to the suit, the trial court did not have jurisdiction over its land and thus lacked authority to enforce its order that Rhodia go onto and perform operations affecting such land. "Jurisdiction is power to hear and determine the matter in controversy according to established rules of law, and to carry

the sentence or judgment of the court into execution." Cleveland v. Ward, 116 Tex. 1, 285 S.W. 1063 (1926).

It is conceivable that should Rhodia elect to respond to a mandatory provision such as we have stated by diverting or impounding surface waters, this might give rise to a cause of action by the utility company against Rhodia under the provisions of Art. 7589a, Texas Civil Statutes, if the diversion or impounding damaged the utility company's land. No evidence was presented in the trial court touching on the attitude of that company in this regard, and almost none to indicate whether the company's property might be damaged by Rhodia's taking such action.

When he was asked about possible solutions of problems of the nature encountered in this case, the appellees' expert witness, Dr. Walter A. Quebedeaux, Director of the Pollution Control Department of Harris County, testified that he felt that it is his duty to make such suggestions to the plant in question, but that the actual choice of the method is the duty of the plant. He then testified in detail as to his recommendations, and they comprise the mandatory provisions of the trial court's temporary injunction.

It may be that Rhodia will perfer to follow Dr. Quebedeaux's suggestions as to its land and effect a permanent solution to the problem rather than a temporary one which it might devise, such as placing a temporary covering over its land, but we hold that until there has been an opportunity for a trial of the case on the merits, the appellees are entitled only to have Rhodia stop the flow of arsenic into and adjacent to the public waters and that it was an abuse of discretion for the trial court to order, as temporary relief, that Rhodia engage in extensive coring procedures to discover where arsenic is located, that any arsenic-bearing soil be removed, a neutralizing product be added, the arsenic-bearing soil be replaced, that it be covered with compacted earth and seeded with Bermuda grass, both on its own land

and on that of Houston Lighting & Power Co.

In its brief Rhodia relates that it has already complied with a number of the trial court's mandatory provisions and complains of the expense to which it has been and will be put, but evidence of this was not presented in the trial court and is not properly before us on this appeal.

■ We overrule Section B of Rhodia's point of error on authority of the rule stated in McMurrey Refining Co. v. State, supra, which we have noticed.

■ We find no merit in Section C of appellant's point of error. Rhodia argues that since the Water Quality Act provides for fines and they constitute an adequate remedy at law, the trial court should not have granted the equitable relief of injunction. Sec. 4.02(a) of the Act specifically provides for both the remedies of injunction and civil penalty, and it is clear that under the evidence in this case the trial court was entitled to make the presumed finding that the depositing of arsenic in public waters in the concentrations found is so dangerous as to constitute irreparable injury.

■ We overrule Sections D and E of Rhodia's point of error. It is true that Harris County did not seek mandatory relief in its application, but the petition of the Texas Water Quality Board asked, in the alternative, that Rhodia be enjoined to take such steps as are necessary to alleviate and/or abate the polluted condition of the public water. The record does not reflect that any special exceptions were directed to such pleading or were urged upon the court. We hold that under the provisions of Rule 90, Texas Rules of Civil Procedure, the "defect, omission or fault", if any, of the Water Quality Board's petition in not pleading more specifically as to the type of mandatory relief sought, was waived. McKee v. City of Mt. Pleasant, 328 S.W.2d 224 (Tex.Civ.App.1958, no writ); Hice v. Cole, 295 S.W.2d 661 (Tex.Civ.App.1956, no writ).

It is clear that Rhodia received due notice of the allegations and proceedings in question and that a full and extended hearing was held before the trial court issued its order. We find no denial of due process.

We modify the mandatory provisions of the trial court's temporary injunction by substituting for them: Rhodia, Inc., is enjoined during the pendency of this suit to take whatever steps are necessary to prevent surface waters and tidal waters from directly or indirectly carrying arsenic in concentrations of more than one part per million from Rhodia's property into or adjacent to Vince Bayou.

The order of the trial court is, as thus modified, affirmed.